## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MISTY WHITE, JERMAINE )
BRADFORD, JANARA MUSGRAVE, )
LANDON PROUDFIT, BRADLEY )
BARBER, JR., and DAKOTA KAPPUS, )
on behalf of themselves and all others )
similarly situated, )
)
      Plaintiffs, )
)
v. )    Case No. CIV-19-01145-JD
)
HON. PAUL HESSE, in his official )
capacity as Chief Judge of the 26th )
Judicial District; and )
HON. KHRISTAN STRUBHAR, )
in her official capacity as Special )
District Judge in the Canadian County )
District Court, )
)
      Defendants. )

## <u>ORDER</u>

Before the Court is Chief Judge Paul Hesse and Special Judge Khristan Strubhar's (collectively "Defendants") Motion to Dismiss ("Motion") [Doc. No. 65]. Plaintiffs responded ("Response") [Doc. No. 68], and Defendants replied ("Reply") [Doc. No. 73]. The parties also filed notices of supplemental authority. *See* [Doc. Nos. 82, 83, 85, 86, and 87].

The Motion seeks dismissal of Plaintiffs Misty White, Jermaine Bradford, Janara Musgrave, Landon Proudfit, Bradley Barber, Jr., and Dakota Kappus's (collectively "Plaintiffs") Amended Complaint [Doc. No. 64] under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). For the reasons stated below, the Court GRANTS the Motion in part and DENIES the Motion in part.

## I.    **BACKGROUND**

Accepting as true the well-pleaded facts in the Amended Complaint, Chief Judge Hesse is responsible for adopting rules of administration in the Canadian County District Court and supervising the other judges. [Doc. No. 64 ¶ 12]. He is also responsible for oversight of the Canadian County bail system. [*Id.* ¶ 14].

Chief Judge Hesse has issued a single administrative order ("the bail order") concerning Canadian County's bail procedures. [*Id.*]. The bail order, in part, states:

ADMINISTRATIVE ORDER RE: AMENDED BAIL SCHEDULE

The purpose of this bail schedule is to provide a means for a person arrested without a warrant, or for a traffic offense, to obtain immediate release from jail without waiting to appear before a judge of the district court. At a person's first court appearance, the amount of bail, if any is allowed, shall lie with the sound discretion of the judge based upon an individualized inquiry into the amount necessary to satisfy the purposes of bail. The bail schedule set forth herein may be used as a guide for the judges of this district in the exercise of discretion in setting bail.

If a person is arrested without a warrant for a bailable violation of state law and a peace officer has reasonable cause to believe that the amount of bail set forth in this schedule is insufficient to assure the defendant's appearance or the protection of the public, the peace officer shall contact a judge of the district court and provide relevant information in support of a higher bail. Bail may then be ordered in an amount different than set forth herein.

[Doc. No. 64-1 at 2].[1]

---

[1] The Court uses page numbering from the CM/ECF stamp across the top of docket filings.

The bail order then includes a schedule that details which offenses are bailable and what the preset bail amount is for those offenses. [*Id.* at 2–5]. Arrestees who can pay the preset bail are released soon after their arrest. [Doc. No. 64 ¶ 17]. Those who cannot afford bail are jailed after their first court appearance. [*Id.*]. Then, indigent arrestees often must wait in jail for weeks before their preliminary hearing, which Plaintiffs allege constitutes "their first opportunity to have a meaningful hearing on pretrial release." [*Id.* ¶¶ 17, 40]. The bail order does not establish what procedures a special judge must follow when conducting first court appearances, nor does it mention any individualized inquiry into considerations such as an arrestee's flight risk, dangerousness, or ability to pay. [*Id.* ¶ 15].

Judge Strubhar is the special judge assigned to implement the bail order. [*Id.* ¶ 16]. Judge Strubhar conducts the first court appearances by video from her chambers. [*Id.*]. At first court appearances, Judge Strubhar "simply informs arrestees of their cash bail amounts" without "ask[ing] arrestees about factors relevant to the bail determination" or giving them "an opportunity to ask questions, make arguments, or present evidence." [*Id.*]. These proceedings last "only a few minutes." [*Id.*]. Judge Strubhar "does not explain the cash bail amounts that she sets." [*Id.*].

Plaintiffs do not allege that prosecutors are present at these proceedings. While the bail order provides limited circumstances in which peace officers may be involved in the bail determination, *see* [Doc. No. 64-1 at 2], there is no allegation that an officer was involved in any of Plaintiffs' first court appearances. Arrestees are not represented by counsel at these proceedings. [Doc. No. 64 ¶¶ 22, 32]. The only people present and

3

participating in the first court appearances are Judge Strubhar and the accused. [*Id.* ¶¶ 16, 22–29]. According to Plaintiffs, Chief Judge Hesse "knows or should know" how Judge Strubhar implements the bail order when conducting first court appearances. [*Id.* ¶ 18].

All Plaintiffs were jailed after their arrests because they could not afford to pay their bail. At the time of the Amended Complaint's filing:

- Misty White was jailed for ten days before her first court appearance and had been in jail for twenty-three days because she could not afford to pay for her release.

- Jermaine Bradford was jailed for six days before his first court appearance and had been in jail for sixteen days because he could not afford to pay for his release.

- Janara Musgraves was jailed for one week before her first court appearance and had been in jail for twenty-eight days because she could not afford to pay for her release.

- Landon Proudfit was jailed for three weeks before his first court appearance and had been in jail for nearly a month because he could not afford to pay for his release.

- Bradley Barber, Jr., was jailed for one week before his first court appearance and had been in jail for three weeks because he could not afford to pay for his release.

- Dakota Kappus was jailed for weeks before his first court appearance and had been in jail for over a month because he could not afford to pay for his release.[2]

[*Id.* ¶¶ 24–29].

Plaintiffs bring claims under 42 U.S.C. § 1983 for violation of their Fourteenth and Sixth Amendment rights. [*Id.* ¶¶ 71–85]. They seek injunctive and declaratory relief against Chief Judge Hesse and declaratory relief against Judge Strubhar. [*Id.* at 21–22].

## II.    <u>LEGAL STANDARDS</u>

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Under this standard, the Court accepts the well-pleaded facts alleged as true and views them in the light most favorable to the nonmoving party. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court must "draw on its judicial experience and common sense" to determine whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 678–79. "In other words, dismissal under Rule 12(b)(6) is

---

[2] The Amended Complaint does not specify how many weeks Dakota Kappus was jailed before his first court appearance.

appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017).[3]

## III.    <u>ANALYSIS</u>

Defendants argue that this case should be dismissed because the Court should abstain from deciding it and because they are immune from suit. Defendants also maintain that Plaintiffs' claims should be dismissed because the allegations in the Amended Complaint are factually or legally insufficient. The Court begins by addressing abstention and immunity. Because the Court determines that neither justifies dismissal at this stage, the Court then proceeds to analyze the constitutional claims, starting with the alleged supervisory liability claim against Chief Judge Hesse, then addressing Plaintiffs' Fourteenth Amendment claims, and finally addressing their Sixth Amendment claim. The Court ultimately concludes Plaintiffs have plausibly alleged that both Defendants violated Plaintiffs' procedural due process rights under the Fourteenth Amendment.[4]

---

[3] While Defendants also move to dismiss under Rule 12(b)(1), they fail to say which arguments they are advancing under this standard. Ultimately, because a facial challenge under Rule 12(b)(1) requires the Court to "apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged," *Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 865 (10th Cir. 2019) (citation omitted), Defendants' failure does not impact the Court's analysis.

[4] Two issues are worth noting at the outset. First, Defendants' Motion does not demonstrate that declaratory relief is inappropriate. Such relief could remedy the alleged ongoing constitutional violation Defendants commit against this putative class of plaintiffs. *See Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011). Second, given the Supreme Court's recognition that putative class actions challenging pretrial detention are "distinctly 'capable of repetition, yet evading review,'" the Court is satisfied that this action is not moot at this juncture. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) ("We recognized in *Gerstein* that '[s]ome claims are so inherently transitory that the trial court will not have

However, Plaintiffs have failed to allege plausible Fourteenth Amendment claims for substantive due process and equal protection or a Sixth Amendment claim for right to counsel.

### A.    Abstention is not appropriate at this stage.

Defendants argue the Court should abstain from reaching the merits of this case because the principles of "[f]ederalism and comity preclude [the] Court from issuing an injunction against the Defendant State Judges." Motion at 33 (emphasis omitted). They contend that by entertaining Plaintiffs' requests for relief, the Court will improperly "sit in constant supervision of the actions of state judicial officers." *Id.* (quoting *Pulliam v. Allen*, 466 U.S. 522, 539 (1984)).

The *Younger* abstention doctrine is rooted in fundamental notions of comity and federalism that motivate a "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971). Given "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States," *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989). Such "exceptional circumstances" exist in "three types of proceedings": (1) "ongoing state criminal prosecutions," (2) "certain 'civil enforcement proceedings,'" and (3) "pending 'civil proceedings involving certain orders . . . uniquely

---

even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" (alteration in original) (citation omitted)).

in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 368). "Under the *Younger* abstention doctrine," the Tenth Circuit has instructed, "federal courts should not interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—when a state forum provides an adequate avenue for relief." *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1267 (10th Cir. 2002) (internal quotations omitted) (quoting *Weitzel v. Div. of Occupational & Pro. Licensing*, 240 F.3d 871, 875 (10th Cir. 2001)).

The *O'Shea* abstention doctrine—an application of *Younger* abstention—counsels federal courts against intervening when plaintiffs seek "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974). More specifically, the Supreme Court has condemned the "continuous supervision by the federal court over the conduct of the petitioners," which would essentially amount to "an ongoing federal audit of state criminal proceedings." *Id.* at 500–01.

Here, Plaintiffs do not seek to enjoin any state criminal prosecutions. They seek quicker bail determinations and procedural protections during those bail proceedings. The allegations in this case resemble *Gerstein v. Pugh*, 420 U.S. 103 (1975), in which the Supreme Court agreed with the district court's conclusion that abstention was not appropriate. In *Gerstein*, Florida arrestees sought injunctive relief to receive faster probable cause determinations in their state court proceedings. *Id.* at 105–06. The state

argued that the arrestees' claims should be barred, but the Supreme Court recognized that abstention was inappropriate since "[t]he injunction was not directed at the state prosecutions . . . but only at the legality of pretrial detention without a judicial hearing," and an order to hold probable cause hearings "could not prejudice the conduct of the trial on the merits." *Id.* at 108 n.9.

Like the *Gerstein* arrestees who sought prompt probable cause determinations, Plaintiffs seek prompt and meaningful bail determinations. So, the Court concludes abstention, under either *Younger* or *O'Shea*, is inappropriate. *See Gerstein*, 420 U.S. at 108 n.9; *see also Schultz v. Alabama*, 42 F.4th 1298, 1312 (11th Cir. 2022) (holding that abstention is inappropriate when a defendant "merely seeks a faster bail determination, which does not require enjoining or even interfering with any ongoing or imminent state prosecution"); *Feltz v. Regalado*, No. 18-cv-0298-SPF-JFJ, slip op. at 32–39 (N.D. Okla. Apr. 3, 2024) (declining to apply *O'Shea* abstention in light of *Gerstein*).[5] The Court rejects Defendants' arguments for abstention as a proper basis for dismissing this case at the pleading stage.[6]

_____

[5] The Court may consider a district court decision for its persuasive value on a particular point, but it also acknowledges that "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011)).

[6] Defendants offer supplemental persuasive authority, *Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023), on *Younger* abstention. [Doc. Nos. 83 and 83-1]. But Defendants' prior briefing does not contain sufficient analysis for the Court to determine available state remedies, which was integral to that court's decision. *See* 64 F.4th at 629–31 (explaining that "Texas law expressly provides mechanisms for challenging excessive

**B.    Defendants are not immune from suit.**

Defendants assert they are both entitled to absolute judicial immunity for Plaintiffs' claims seeking injunctive relief. They also argue that Chief Judge Hesse is entitled to legislative immunity. But Plaintiffs seek injunctive and declaratory relief against Chief Judge Hesse and declaratory relief against Judge Strubhar. [Doc. No. 64 at 21].[7] Defendants' immunity arguments therefore only pertain to Chief Judge Hesse.[8]

1.    Chief Judge Hesse is not entitled to judicial immunity.

The Supreme Court has sought to draw a line between "truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges." *Forrester v. White*, 484 U.S. 219, 227 (1988). "Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 228. The Supreme Court's two "factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*,

---

bail" and citing to and discussing those provisions, which the court explained differentiates *Gerstein*). Defendants' briefing offers one juvenile case where no bail was set, *see* Motion at 34 (citing *T.F.M. v. State*, 1977 OK CR 323, 572 P.2d 280), but here, Plaintiffs allege bail was set so that authority is inapposite.

[7] Defendants raise a cursory argument that Eleventh Amendment sovereign immunity bars Plaintiffs' claims. Motion at 33. As Plaintiffs correctly note, under *Ex parte Young*, 209 U.S. 123 (1908), they may seek prospective relief against state officials in their official capacities for an alleged ongoing violation of federal law. Response at 14.

[8] Defendants do not appear to argue they are in any way immune to Plaintiffs' claims for declaratory relief, but the Court nonetheless clarifies that neither judge is entitled to immunity for such claims. *See Lawrence v. Kuenhold*, 271 F. App'x 763, 766 & n.6 (10th Cir. 2008) (unpublished) (explaining that declaratory relief is available "to a plaintiff who sues a judge"). Therefore, immunity is only potentially available for the claims of injunctive relief brought against Chief Judge Hesse.

whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). In short, "[t]he more distant a function is from the judicial process, the less likely absolute immunity will attach." *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990).

Overseeing the Canadian County bail system and issuing administrative orders regarding the bail system—as Plaintiffs allege of Chief Judge Hesse—are not inherently judicial acts. These acts do not take place during any type of court proceedings, and no parties are involved. Such tasks are not performed by a judge as part of his normal duties.

Plaintiffs seek injunctive relief against Chief Judge Hesse only for his administrative acts. Accordingly, judicial immunity does not bar Plaintiffs from seeking injunctive relief against him. *See Parga v. Bd. of Cnty. Comm'rs.*, No. 18-CV-0298-CVE-JFJ, 2019 WL 1231675, at *8 (N.D. Okla. Mar. 15, 2019) (ruling that judicial immunity does not prevent a judge from being sued for "promulgation of [a] secured money-bail schedule").

### 2.    Chief Judge Hesse is not entitled to legislative immunity.

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). The Supreme Court has long "recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 55. For example, when the Commonwealth of Virginia vested in the Supreme Court of Virginia "virtually its entire

legislative or regulatory power over the legal profession," the Supreme Court ruled that Virginia's justices enjoyed legislative immunity since they "exercis[ed] the State's entire legislative power with respect to regulating the Bar, and [they were] the State's legislators for the purpose of issuing the Bar Code." *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 722, 734 (1980).

Here, there has been no such broad delegation of legislative authority. Although Chief Judge Hesse can "adopt rules for the administration of the district courts of which he . . . is in charge," he has not been given the entire legislative or regulatory power over this area. 20 Okla. Stat. Ch. 1, App'x, 2 Rule 8. For example, any rules he seeks to adopt must "be consistent with those adopted by the Supreme Court and those of the Presiding Judge." *Id.* And the Court is unaware of any binding caselaw that requires granting legislative immunity in this situation. Thus, legislative immunity does not bar Plaintiffs from seeking injunctive relief against Chief Judge Hesse.

### C.    Chief Judge Hesse cannot be held liable via supervisor liability for Plaintiffs' equal protection claim.

Defendants argue that Plaintiffs have not pleaded sufficient facts to show a causal link between Chief Judge Hesse's action and the alleged constitutional harm. They also maintain that there is no way Chief Judge Hesse should have been aware of the alleged constitutional violations that were occurring.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). In

12

such situations, "the plaintiff must plausibly plead and eventually prove not only that the
official's subordinates violated the Constitution, but that the official by virtue of his own
conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198
(10th Cir. 2010). Plaintiffs can meet this standard by showing "(1) the defendant
promulgated, created, implemented or possessed responsibility for the continued
operation of a policy that (2) caused the complained of constitutional harm, and (3) acted
with the state of mind required to establish the alleged constitutional deprivation." *Id.* at
1199.

The first element, personal involvement, is evident from the alleged facts of the
case. Plaintiffs allege that Chief Judge Hesse promulgated the bail order and was
responsible for the operation of Canadian County's bail system and the supervision of the
other judges.

For the second element, causation, "[a] plaintiff [must] establish the requisite
causal connection by showing the defendant set in motion a series of events that the
defendant knew or reasonably should have known would cause others to deprive the
plaintiff of her constitutional rights." *Schneider v. City of Grand Junction Police Dep't*,
717 F.3d 760, 768 (10th Cir. 2013) (second alteration in original) (internal quotation
marks and citation omitted). According to Plaintiffs, Chief Judge Hesse's administrative
order fails to require inquiry into an arrestee's ability to pay or the adequacy of
alternatives to cash bail. [Doc. No. 64 ¶ 20]. Nor does the order require procedural
protections, such as notice, an opportunity to be heard, or a prompt hearing. [*Id.* ¶ 21].
Plaintiffs allege that Chief Judge Hesse has not "taken any other action to ensure these

protections are provided." [*Id.*]. Accepting these factual allegations as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs have sufficiently pleaded the causation element as it has been interpreted and applied by the Tenth Circuit. *See Schneider*, 717 F.3d at 768–69; *Dodds*, 614 F.3d at 1203–04. Plaintiffs have plausibly alleged that by promulgating the administrative order without requiring certain protections, Chief Judge Hesse reasonably should have known the bail order would cause Judge Strubhar to deprive arrestees of their constitutional rights during first court appearances. *Cf. Dodds*, 614 F.3d at 1203–04 (determining that a plaintiff satisfied the causation element where the sheriff, as the final policymaker for the jail, had the power to change certain policies that caused the plaintiff's constitutional injury but "under his watch . . . the policies . . . continued to operate").

The third element, state of mind, varies based on what constitutional violation is alleged. *See id.* at 1204 ("[T]he factors necessary to establish a § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision."). Unfortunately, although the parties dispute whether Chief Judge Hesse can be held liable via supervisor liability, neither side provides the Court with analysis regarding what level of culpability is required for each alleged constitutional violation.[9]

---

[9] The parties have forfeited any arguments in this respect. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (explaining that if a "theory simply wasn't raised before the district court, we usually hold it forfeited").

For Plaintiffs' equal protection claim, purposeful discrimination is the state of mind required to establish the alleged constitutional deprivation. *See Iqbal*, 556 U.S. at 676–77, 683 (holding that Iqbal's complaint did not sufficiently allege an equal protection claim against Ashcroft and Mueller because the complaint did not plausibly suggest Ashcroft and Mueller themselves acted with the necessary "discriminatory state of mind," which, in the equal protection context, is that of "purposeful discrimination"). Purposeful discrimination "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 676–77 (cleaned up).

Next, although the Tenth Circuit has not addressed what precise state of mind is necessary to make a procedural due process claim, the Supreme Court has held that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). The Tenth Circuit has noted that various circuit courts have applied *Daniels* by "requiring a state of mind element such as recklessness or gross negligence." *Brown v. Montoya*, 662 F.3d 1152, 1170 (10th Cir. 2011) (citing the Third and Sixth Circuits' standards). But the Tenth Circuit has not taken up the issue. *See id.* ("We need not decide the appropriate state of mind test to resolve this appeal . . . ."). Because, as discussed below, Plaintiffs have alleged that Chief Judge Hesse acted with a state of mind more culpable than negligence, the Court need not determine the exact mental state Plaintiffs must allege to plead their procedural due process claim.

For their substantive due process claim, Plaintiffs must allege that Chief Judge Hesse acted with deliberate indifference. *Dodds*, 614 F.3d at 1205 ("[G]iven Plaintiff alleges a substantive due process violation, it appears Plaintiff must establish that Defendant acted with deliberate indifference to Plaintiff's due process right to post preset bail.").[10] Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

Lastly, no particular state of mind is necessary for Plaintiffs to establish their right to counsel claim under the Sixth Amendment. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings.").

Plaintiffs allege that Chief Judge Hesse knows or should know how Judge Strubhar conducts first court appearances because of Chief Judge Hesse's bail order. [Doc. No. 64 ¶¶ 20–23]. Chief Judge Hesse allegedly knows there is no procedure for collecting financial information from arrestees. [*Id.* ¶ 23]. According to Plaintiffs, he has

---

[10] The Tenth Circuit has not dispositively ruled on what state of mind is required to establish a substantive due process violation. However, at least twice the Tenth Circuit has assumed without deciding that deliberate indifference is the required state of mind for a substantive due process claim. *See Schneider*, 717 F.3d at 769 ("We therefore assume without deciding that deliberate indifference is the applicable state of mind [for a substantive due process claim]."); *Dodds*, 614 F.3d at 1205 (assuming "without deciding" that "deliberate indifference constitutes the required state of mind" for a substantive due process claim). Because the Court locates no binding precedent suggesting that is not the correct standard, it also applies the deliberate indifference standard.

16

not established any guidance or requirement to ensure procedural protections are provided at the first court appearances. [*Id.* ¶ 21]. And he allegedly knows Judge Strubhar does not make any findings on ability to pay, dangerousness, flight risk, or alternatives to detention because no such findings are found in her orders or guided or required by his bail order. [*Id.* ¶¶ 20, 23]. Plaintiffs allege that Judge Strubhar "conducts first court appearances multiple times per week" and "commits the same [constitutional] violations in the same manner each time" and that Chief Judge Hesse "knows or should know of these practices." [*Id.* ¶ 23]. The Amended Complaint states that, despite knowing of Judge Strubhar's allegedly unconstitutional practices and being in supervisory control of her, Chief Judge Hesse "has done nothing to correct these deficiencies and ensure his bail system is enforced consistent with the Constitution." [*Id.* ¶ 18].

Taking these well-pleaded factual allegations as true and construing them in Plaintiffs' favor, the Amended Complaint alleges the required state of mind for Plaintiffs' substantive due process, procedural due process, and right to counsel claims. The factual allegations are sufficient for Plaintiffs' procedural due process and right to counsel claims because the Amended Complaint alleges Chief Judge Strubhar acted with a state of mind more culpable than mere negligence. It is a closer call whether his state of mind rose to the level of deliberate indifference; nevertheless, at the pleading stage, Plaintiffs have sufficiently alleged deliberate indifference. The Amended Complaint plausibly alleges that Chief Judge Hesse knew that Judge Strubhar was implementing the bail order such that it was highly predictable she would violate arrestees' constitutional rights. Viewing the allegations in the light most favorable to Plaintiffs, Chief Judge Hesse consciously

disregarded such risk by failing to take any action to ensure Judge Strubhar implemented any procedural safeguards in first court appearances. These allegations are sufficient to plead deliberate indifference at this stage. *See Brown*, 520 U.S. at 410.

However, nothing in the Amended Complaint alleges that Chief Judge Hesse purposefully discriminated against Plaintiffs. Without such allegations, Chief Judge Hesse cannot be held responsible for Judge Strubhar's actions via supervisory liability, and Plaintiffs' equal protection claim against him cannot survive. Thus, the Court dismisses without prejudice Plaintiffs' equal protection claim for injunctive and declaratory relief against Chief Judge Hesse.

> **D.    For Plaintiffs' claims under the Fourteenth Amendment, only their procedural due process claim survives.**

>> 1.    The Court dismisses Plaintiffs' substantive due process claim against both Defendants.

Plaintiffs argue that, because pretrial liberty is a fundamental right, the Court should apply strict scrutiny to their substantive due process claim. They contend that Chief Judge Hesse's bail order and resulting policies fail strict scrutiny.

"Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations 'without due process of law.'" *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting U.S. Const. amend. XIV, § 1). Substantive due process violations arise in two contexts. The first context is "where government action has infringed a 'fundamental' right without a 'compelling' government purpose." *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721–22 (1997)). The second is "where government action deprives a person of life,

liberty, or property in a manner so arbitrary it 'shocks the conscience.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action.*" *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018). When plaintiffs challenge "the concerted action of several . . . employees, undertaken pursuant to broad governmental policies," the Tenth Circuit considers such claims to be "akin to a challenge to legislative action because, as with an act of a lawmaking body," the government "is attempting, through policy, to achieve a stated government purpose." *Abdi*, 942 F.3d at 1027–28. Accordingly, because the bail order and its enforcement are akin to legislative action for substantive due process purposes, the Court applies *Glucksberg*'s fundamental-rights test.

The Tenth Circuit has delineated a tripartite framework for analyzing substantive due process claims under *Glucksberg*:

> First, the reviewing court must determine whether a fundamental right is at stake either because the Supreme Court or the Tenth Circuit has already determined that it exists or because the right claimed to have been infringed by the government is one that is objectively among those "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" such that it is "fundamental." Second, the court must determine whether the claimed right—fundamental or not—has been infringed through either total prohibition or "direct[ ] and substantial[ ]" interference. Third, if the right infringed is a fundamental right, the court must determine whether the government has met its burden to show that the law or government action interfering with the right is narrowly tailored to achieve a compelling government purpose. If the right is not fundamental, we apply rational basis review.

*Abdi*, 942 F.3d at 1028 (alterations in original) (citations omitted).

19

First, regarding whether a fundamental right is at stake, Plaintiffs assert that the Supreme Court recognized that "the right to pretrial liberty is 'fundamental'" in *United States v. Salerno*, 481 U.S. 739, 750 (1987). Response at 20. However, neither the Tenth Circuit nor this Court reads *Salerno* to stand for that proposition.

The *Salerno* Court recognized "the individual's strong interest in liberty," but it did not "categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" 481 U.S. at 750–751 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)). Without applying strict scrutiny—the level of scrutiny with which it would analyze a governmental restriction of a fundamental right—the Supreme Court upheld the Bail Reform Act of 1984 as furthering "[t]he government's interest in preventing crime by arrestees," which "is both legitimate and compelling." *Id.* at 749. "Given the well-established authority of the government, in special circumstances, to restrain individuals' liberty prior to or even without criminal trial and conviction," the Court upheld the act as rationally related to a legitimate "regulatory interest in community safety." *Id.* at 748–49; *see also United States v. Deters*, 143 F.3d 577, 583 (10th Cir. 1998) ("In *Salerno*, the Court noted that the government's interest in community safety was 'legitimate and compelling,' but it did not appear to apply the narrowly-tailored-to-serve-a-compelling government-interest test that traditionally governs cases involving fundamental rights." (citation omitted)).

Relying on *Salerno*, the Tenth Circuit has concluded that the "right to be free from pretrial detention . . . is not a fundamental right." *Dawson v. Bd. of Cnty. Comm'rs of*

*Jefferson Cnty.*, 732 F. App'x 624, 632 (10th Cir. 2018) (unpublished). Given this guidance from the Tenth Circuit and the Supreme Court's continued warning to be reluctant "to break new ground in this field," *Glucksberg*, 521 U.S. at 720 (citation omitted), the Court holds that Plaintiffs' right to pretrial liberty is not a fundamental right. *Cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))).

Second, regarding whether the claimed right has been infringed, Plaintiffs have sufficiently alleged that their detention constitutes a complete deprivation of their non-fundamental right to pretrial liberty. Plaintiffs allege they were jailed after their arrests because they could not afford to pay bail. *See* [Doc. Nos. 64 ¶¶ 24–29].

Finally, the Court must determine whether the infringement of that right is rationally related to a legitimate governmental interest. "Under rational basis review," the Court "will uphold a law 'if there is any reasonably conceivable state of facts that could provide a rational basis for the [infringement].'" *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1122 (10th Cir. 2021) (alteration in original) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). This standard "requires 'no more than a "reasonable fit" between governmental purpose . . . and the means chosen to advance that purpose.'" *Id.* (quoting *Reno v. Flores*, 507 U.S. 292, 305 (1993)).

The state has a legitimate interest in assuring an accused's presence at trial. And requiring arrestees to post bail, or detaining them if they cannot, is rationally related to that interest. *See Stack v. Boyle*, 342 U.S. 1, 4–5 (1951) ("The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused." (citation omitted)).

Thus, the Court determines that Defendants' alleged infringement on Plaintiffs' non-fundamental right to pretrial freedom survives rational basis review. Accordingly, the Court dismisses Plaintiffs' substantive due process claim without prejudice.

2. <u>Plaintiffs have not alleged a plausible equal protection claim against Judge Strubhar.</u>

Plaintiffs allege that Judge Strubhar has violated their equal protection rights by not inquiring into their ability to pay, considering alternatives to cash bail, or issuing any findings before mechanically issuing cash bail orders at first court appearances. In doing so, Plaintiffs allege, Judge Strubhar unlawfully jails indigent arrestees because they cannot afford cash bail, whereas similarly situated arrestees who can afford to pay bail walk free. Defendants assert that Plaintiffs are not part of a suspect class triggering strict scrutiny, they have not been deprived of a fundamental right, and they have not alleged the purposeful discrimination required to make a claim under the Equal Protection Clause. Motion at 24–25.

22

Under the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To state a viable equal protection claim, Plaintiffs must allege that" a state action "purposefully discriminates against them because of their membership in a particular class." *Fowler v. Stitt*, 104 F.4th 770, 783–84 (10th Cir. 2024) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008) and *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021)). "A corollary to this principle is that a [plaintiff] must prove that the purposeful discrimination 'had a discriminatory effect' on him." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (citation omitted). Only after "a plaintiff shows discriminatory intent and an adverse effect" will the Court "review[] the government action under the appropriate level of scrutiny." *Ashaheed*, 7 F.4th at 1250.

To show discriminatory intent, "a plaintiff need not allege that discrimination 'was the sole, or even the primary, motivation.'" *Fowler*, 104 F.4th at 784 (quoting *Navajo Nation v. New Mexico*, 975 F.2d 741, 743 (10th Cir. 1992)). Nevertheless, purposeful discrimination "implies more than intent as volition or intent as awareness of consequences." *McCleskey*, 481 U.S. at 298 (citation omitted). Rather, "[i]t implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (citation omitted). The Supreme Court "has never required proof of discriminatory animus, hatred, or bigotry" to allege purposeful discrimination, for the "'intent to

23

discriminate' forbidden under the Equal Protection Clause is merely the intent to treat differently." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

"Discriminatory intent can be proved directly or circumstantially." *Ashaheed*, 7 F.4th at 1250. Direct proof of purposeful discrimination shows that "a distinction between groups of persons appears on the face of a state law or action." *Id.* (citation omitted). "When a distinction is facially apparent, purposeful discrimination is presumed and no further examination of intent is required." *Fowler*, 104 F.4th at 784 (citing *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021)). However, "[t]his is not to say that the necessary discriminatory [ ] purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant" when considering equal protection claims, for a statute or policy, "otherwise neutral on its face, must not be applied so as invidiously to discriminate" against a suspect class. *Washington v. Davis*, 426 U.S. 229, 241 (1976). Thus, a plaintiff can allege purposeful discrimination via circumstantial proof, and "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Id.* at 242. Relevant facts for inferring discriminatory intent may include "whether the state action disparately impacts one group. . . . the 'historical background of the decision,' the 'specific sequence of events leading up to the challenged decision,' and '[d]epartures from the normal procedural sequence.'" *Fowler*, 104 F.4th at 784 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). Thus, disparate impact "is not irrelevant, but it is not the sole touchstone" of purposeful discrimination. *Washington*, 426 U.S. at 242. Standing alone, a showing of disparate impact does not trigger strict scrutiny. *Id.*

24

Plaintiffs suggest otherwise, citing *Williams v. Illinois*, 399 U.S. 235, 242 (1970), for the proposition that "[t]his inquiry does not require intentional discrimination; disparate impact is sufficient." Response at 17 n.6. In *Williams*, the Supreme Court held that it constitutes "impermissible discrimination" under the Equal Protection Clause for a state to impose a period of imprisonment beyond the statutory maximum if that imprisonment "results directly from an involuntary nonpayment of a fine or court costs." 399 U.S. at 240–41. There, the state's statutory scheme did "not distinguish between defendants on the basis of ability to pay fines," but the Court emphasized that "'a law nondiscriminatory on its face may be grossly discriminatory in its operation.'" *Id.* at 242 (quoting *Griffin v. Illinois*, 351 U.S. 12, 17 n.11 (1956)). The Court concluded that the statute "works an invidious discrimination solely because [the defendant] is unable to pay the fine," thus "visit[ing] different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment." *Id.*

The Supreme Court did not hold in *Williams* that disparate impact alone is sufficient to state a claim for invidious discrimination under the Equal Protection Clause. Rather, the Court's analysis is perfectly consistent with its precedents—from both before and after *Williams*—stating that intentional discrimination can be shown through circumstantial evidence, which may include disparate impacts. *See Whitus v. Georgia*, 385 U.S. 545, 550 (1967) (stating in an equal protection challenge that "[t]he burden is, of course, on the petitioners to prove the existence of purposeful discrimination," then concluding that the petitioners met that burden by producing statistics showing

discrimination in jury-selection procedures). Supreme Court decisions issued after *Williams* strongly suggest that the Court was not opening the door to equal protection claims brought solely on the basis of disparate impacts absent purposeful disparate treatment. *Washington*, 426 U.S. at 239 ("[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact."); *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) ("Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.'" (citation omitted)). Nothing in *Williams*, *Tate v. Short*, 401 U.S. 395 (1971), *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), or *Bearden v. Georgia*, 461 U.S. 660 (1983), altered the basic principle that a showing of intentional discrimination—either by direct or circumstantial proof—is necessary to state a claim for invidious discrimination under the Equal Protection Clause.[11]

Turning, then, to the Amended Complaint, Plaintiffs have not alleged the purposeful discrimination required to state an equal protection claim. There is no direct proof of any discriminatory purpose on the face of the administrative order, which instructs judges to conduct "an individualized inquiry into the [bail] amount necessary to

---

[11] Plaintiffs' Response asserts that their "detention resulting from poverty—the 'absolute deprivation of a meaningful opportunity' for release—. . . constitutes 'de facto discrimination'" under *Rodriguez*. Response at 16 (emphasis omitted). But this "de facto discrimination" dicta from the *Rodriguez* Court's summary of *Griffin v. Illinois*, 351 U.S. 12 (1956), did not create a new standard or alter the Equal Protection Clause's purposeful discrimination requirement.

satisfy the purposes of bail" without any indication that judges should consider a person's indigency or economic status when making this determination. [Doc. No. 64-1 at 2].

Plaintiffs have also not alleged intentional discrimination circumstantially. According to the Amended Complaint, "Judge Strubhar regularly jails arrestees pretrial solely because they are unable to pay cash bail amounts she sets at their first court appearance." [Doc. No. 64 ¶ 22]. But setting aside this conclusory statement at the pleading stage, there is no allegation of purposeful discrimination that is sufficient to state a claim for invidious discrimination. Plaintiffs have alleged that Judge Strubhar's implementation of the bail order has a disparate impact on indigent persons, but as the Supreme Court has made clear, disparate impact alone is insufficient to state a claim. Considering the totality of allegations, Judge Strubhar "conducts first court appearances as rushed, confusing proceedings lasting only a few minutes, during which she simply informs arrestees of their cash bail amounts." [*Id.* ¶ 16]. She does not inquire into an arrestee's ability to pay. [*Id.* ¶ 22]. Accepting these factual allegations as true, Judge Strubhar does not consider an arrestee's indigency when setting bail in these very short proceedings; if she does not know whether arrestees are indigent, it cannot be said that she sets their bail *because of* the bail amount's adverse effect on impoverished arrestees. *See McCleskey*, 481 U.S. at 292. Although Plaintiffs' factual allegations may well raise procedural due process concerns, these allegations are incongruous with a claim that Judge Strubhar purposefully discriminates against poor arrestees because of their indigent status.

Because Plaintiffs have not plausibly alleged purposeful discrimination, they have not stated a claim under the Equal Protection Clause.[12] The Court dismisses Plaintiffs' equal protection claim without prejudice.

3.    <u>Plaintiffs have plausibly alleged that Defendants violated their procedural due process rights.</u>[13]

Plaintiffs argue their detention violates procedural due process because it was not implemented in a fair manner. Defendants argue since "there is no right to affordable bail at an initial appearance, Plaintiffs' procedural due process claim can be easily rejected." Motion at 23–24.

"Under a procedural due process analysis," the Court "must consider whether the state has impermissibly affected an individual right or has done so in an arbitrary fashion." *Vasquez v. Cooper*, 862 F.2d 250, 255 (10th Cir. 1988). The Fourteenth Amendment requires state "conduct depriving a person of life, liberty, or property [to] be implemented in a fair manner." *Id.* (citing *United States v. Salerno*, 481 U.S. 739 (1987)).

---

[12] Some of the parties' briefing on this issue addresses whether Plaintiffs' claim triggers heightened scrutiny under *Bearden* and *Rodriguez*. *See* Response at 15–17; Reply at 5–9. But the Court does not reach this issue because Plaintiffs have not sufficiently alleged purposeful discrimination. *See Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) ("Once a plaintiff shows discriminatory intent and an adverse effect, a court reviews the government action under the appropriate level of scrutiny.").

[13] Since Plaintiffs dispute the legality of their confinement, not the conditions or restrictions of their confinement, the Court does not analyze whether their confinement amounts to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.").

The "standard analysis" under the Due Process Clause "proceeds in two steps." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). First, courts "ask whether there exists a liberty or property interest of which a person has been deprived." *Id.* If so, the court must then "ask whether the procedures followed by the State were constitutionally sufficient." *Id.* In evaluating the constitutional sufficiency of the procedures and their fundamental fairness, the Court considers "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)).[14] Boiled down, "[t]he fundamental requirement of due process

---

[14] In *Medina v. California*, 505 U.S. 437, 443 (1992), the Supreme Court held that "the *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules [that] are part of the criminal process." Rather, the "proper analytical approach" is the one "set forth in *Patterson v. New York*, 432 U.S. 197 (1977)," which held that

> it is normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Medina*, 505 U.S. at 445 (quoting *Patterson*, 432 U.S. at 201–02) (internal quotation marks omitted). "As *Patterson* suggests, because the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area." *Id.* at 445–46. Thus, the *Medina* Court applied the "far less intrusive" *Patterson* test to hold that allocating the burden of proof to criminal defendants in state competency proceedings does not offend due process. *Id.* at 446.

is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

*Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).[15]

First, Plaintiffs have a liberty interest in their freedom pending trial. *See Salerno*, 481 U.S. at 750; *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010). So, the Court asks whether Plaintiffs have plausibly alleged that the bail procedures promulgated by Chief Judge Hesse and effectuated by Judge Strubhar are constitutionally deficient.

As an initial matter, Plaintiffs have alleged a particularly weighty private interest in their pretrial liberty. Although pretrial liberty is not a fundamental right, "[i]n our

---

This civil challenge to the implementation of an administrative order regarding first court appearances is properly assessed under the *Mathews* test. Unlike *Medina*, "[t]his is not a case about presumptions, evidence, or any workaday aspect of the process-in-action." *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 431 (5th Cir. 2017). This challenge to first court appearances does not implicate the criminal trial itself or the central issue of guilt or innocence. Further, the bail order was issued by Chief Judge Hesse rather than the state legislature, so the federalism concerns animating *Medina* are not as strong here. Persuasive decisions from other circuits have applied *Mathews* to similar challenges. *E.g.*, *Schultz v. Alabama*, 42 F.4th 1298, 1332–33 (11th Cir. 2022). For these reasons, the Court follows suit and applies the *Mathews* balancing test to Plaintiffs' procedural due process challenge.

[15] Defendants' Reply argues that "[u]nlawful pretrial detention claims are always judged under the Fourth Amendment, even beyond the start of legal process." Reply at 6–7 n.4 (citing *Manuel v. City of Joliet*, 580 U.S. 357 (2017)). "So, to the extent Plaintiffs are asserting constitutional violations relating to their pretrial detention other than excessive bail, their claim is governed by the Fourth Amendment—under which they have made no claim." *Id.* First, the Court does not read the Motion to raise this argument, and when a reply brief raises a new argument, "the court can avoid error only by not relying on the new materials and arguments in the movant's reply brief" or by allowing a surreply. *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006). The Court will neither rely on this new argument nor allow a surreply. Second, Plaintiffs' Amended Complaint, which alleges that the first court appearance is constitutionally deficient because it does not provide arrestees with notice or an opportunity to be heard, implicates the core of the Due Process Clause's procedural protections. *See* [Doc. No. 64 ¶ 21].

society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755.

Next, the Court considers the risk of an erroneous deprivation of Plaintiffs' interest in their pretrial liberty through the procedures employed in first court appearances, as well as any probable value of the additional procedural safeguards Plaintiffs seek. The Amended Complaint alleges that Chief Judge Hesse's administrative order fails to require protections such as an inquiry into an arrestee's ability to pay bail, consideration of "alternative conditions of release for arrestees who cannot afford their bail," or individualized findings as to each arrestee. [Doc. No. 64 ¶ 20]. Plaintiffs also allege that the administrative order fails to require certain procedural protections, including "notice to arrestees of what is at stake," "an opportunity for arrestees to be heard or present evidence," a prompt hearing after arrest, or "substantive findings regarding dangerousness or flight risk that judges must make to issue unaffordable cash bail orders that result in pretrial detention." [*Id.* ¶ 21]. Plaintiffs allege that Judge Strubhar has not independently implemented such protections absent guidance in the bail order to do so. [*Id.* ¶ 22].

Assessing these allegations in the light most favorable to Plaintiffs, they have alleged that first court appearances pose a considerable risk of erroneously depriving arrestees of their pretrial liberty. Without individualized, substantive findings as to arrestees' ability to pay, dangerousness, flight risk, or alternatives to detention, there is plausibly a considerable risk of depriving arrestees of their pretrial liberty without furthering the purposes of bail. The procedural safeguards Plaintiffs point to in their

Amended Complaint—including notice and an opportunity to be heard—would plausibly have great value in assuaging this risk. By implementing these safeguards at a first court appearance conducted shortly after arrest, Defendants could promptly ascertain the necessity of the arrestee's pretrial confinement and give the arrestee a meaningful opportunity to be heard within a reasonable amount of time.

Finally, the Court considers the Defendants' interests, including the function of first court appearances and the fiscal and administrative burdens that Plaintiffs' proposed procedural requirements would impose. According to the Motion, "[t]here are rational reasons for holding quick initial appearances without requiring the type of evidence and testimony one would expect at a post-initial-appearance bail hearing." Motion at 23. "Those reasons include: efficiency, judicial resources, [and] protection of the public from potentially dangerous arrestees whom the judge has not had adequate time to evaluate for appropriate conditions of release." *Id.* (footnote omitted). Further, as discussed above, the Supreme Court has recognized the state's legitimate interest in assuring the accused is present at trial, and the Court has acknowledged that setting bail furthers that interest. *See Stack v. Boyle*, 342 U.S. 1, 4–5 (1951). These interests are considerable.

Nevertheless, taking the Amended Complaint in the light most favorable to Plaintiffs, it is plausible that additional procedural safeguards would not impose a substantial fiscal or administrative burden on Defendants. The administrative order already requires judges setting bail to conduct an "individualized inquiry into the amount necessary to satisfy the purposes of bail" [Doc. No. 64-1 at 2]; Plaintiffs allege that Judge Strubhar simply ignores this requirement [Doc. No. 64 ¶ 22]. Individualized assessments

of the sort envisioned by the bail order could presumably include the kinds of procedural protections Plaintiffs seek without imposing undue administrative or fiscal burdens. It is plausible that providing arrestees with certain safeguards at first court appearances — such as notice, an opportunity to be heard, and an individualized assessment—would not be a substantial burden on Defendants.

Thus, under the *Mathews v. Eldridge* balancing test, Plaintiffs have plausibly alleged that both Defendants have violated their procedural due process rights.

### E.    Plaintiffs have not plausibly alleged a Sixth Amendment claim.

Lastly, Plaintiffs allege that Defendants violate their Sixth Amendment rights by not providing them with counsel at the first court appearance, which they contend is a critical stage. Defendants argue that Plaintiffs' rights have not been violated because their first court appearances did not lead to any prejudice and are not a critical stage under the Sixth Amendment.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *cf. Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The Sixth Amendment [is] applicable to the States by the terms of the Fourteenth Amendment . . . ."). The Sixth Amendment right to counsel "is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (citation omitted). "Attachment occurs when the government has used the judicial machinery to signal a commitment to prosecute." *Id.* at 211. The Court holds—and Defendants do not dispute—that the right to counsel attaches at the first court appearance. *See id.* at 213 ("[A] criminal defendant's initial appearance

before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."); *Kirby v. Illinois*, 406 U.S. 682, 689–90 (1972) (noting that "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"—is the point "that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable").

"Once attachment occurs," the Sixth Amendment inquiry is not finished, for "the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the postattachment proceedings." *Rothgery*, 554 U.S. at 212 (footnote omitted). A hearing that triggers attachment of the right to counsel is not necessarily a critical stage at which counsel must be present. *See id.* A "critical stage" is "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 (2002). While, historically, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor," the Supreme Court later "recognize[d] that 'Assistance' would be less than meaningful if it were limited to the formal trial itself." *United States v. Ash*, 413 U.S. 300, 309–10 (1973). Thus, the Court has "expanded the constitutional right to counsel" to various "trial-like confrontations" in which "the function of the lawyer" is "essentially the same as his function at trial." *Id.* at 311–12. In these "critical" pretrial events, "the accused [is]

34

confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Id.* at 310.

To determine whether a proceeding is a "critical stage," the Court must "scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial." *United States v. Wade*, 388 U.S. 218, 227 (1967). This analysis requires the Court "to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Id.* Stated differently, the Court must "examin[e] [ ] the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Ash*, 413 U.S. at 313.[16]

Neither the Supreme Court nor the Tenth Circuit has determined whether a bail hearing is a "critical stage" for Sixth Amendment purposes. Nevertheless, two Supreme Court precedents are instructive here. First, in *Coleman v. Alabama*, 399 U.S. 1, 10 (1970), the Supreme Court held that a pre-indictment preliminary hearing in Alabama state court constituted "a 'critical stage' of the State's criminal process at which the accused is 'as much entitled to such aid (of counsel) . . . as at the trial itself.'" (alterations in original) (quoting *Powell v. Alabama*, 287 U.S. 45, 59–60 (1932)). The State put on

---

[16] Defendants' Motion correctly cites the critical stage standard as set forth in *Ash* and *Wade*. Motion at 28. However, Defendants' application of that standard is flawed. Under *Wade* and *Ash*, the guiding inquiry is the *risk* of prejudice that inheres in a particular *type* of proceeding. Defendants' focus on the prejudice Plaintiffs' first appearances caused in their cases is therefore misplaced. The correct analysis is whether potential substantial prejudice to defendants' rights generally inheres in these first court appearances and whether counsel could help avoid that prejudice. *See Wade*, 388 U.S. at 227.

evidence and questioned witnesses at these hearings, the "sole purposes" of which were "to determine whether there [was] sufficient evidence against the accused to warrant presenting his case to the grand jury and, if so, to fix bail if the offense [was] bailable." *Id.* at 8. Applying its test from *Wade*, the Court held that "[p]lainly the guiding hand of counsel at the preliminary hearing is essential to protect the indigent accused against an erroneous or improper prosecution," in part because counsel could be helpful at these hearings "in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail." *Id.* at 9.

In a later case, *Gerstein v. Pugh*, 420 U.S. 103, 120–23 (1975), the Court held that "the probable cause determination required by the Fourth Amendment" is not a "critical stage" at which the presence of counsel is necessary. The *Gerstein* Court reached this conclusion by noting that hearings determining probable cause for detaining an arrested person are distinct from the preliminary hearing at issue in *Coleman* in two salient ways. First, whereas in *Coleman* "the function of the preliminary hearing was to determine whether the evidence justified charging the suspect with an offense" and a "finding of no probable cause could mean that he would not be tried at all," a probable cause hearing "is addressed only to pretrial custody." *Gerstein*, 420 U.S. at 123. "To be sure," the Court reasoned, "pretrial custody may affect to some extent the defendant's ability to assist in preparation of his defense, but this does not present the high probability of substantial harm identified as controlling in *Wade* and *Coleman*." *Id.* The second notable difference was that "Alabama allowed the suspect to confront and cross-examine prosecution witnesses at the preliminary hearing." *Id.* Thus, a "suspect's defense on the merits could

36

be compromised if he had no legal assistance for exploring or preserving the witnesses' testimony"; however, "[t]his consideration does not apply when the prosecution is not required to produce witnesses for cross-examination." *Id.*

The first court appearance in this case has the same two features that distinguished the preliminary hearing in *Coleman* from the hearing determining probable cause for detention in *Gerstein*: the proceeding addresses only pretrial custody, and no prosecutor is present to produce witnesses or evidence. These proceedings are non-adversarial. The bail order says that a "peace officer shall contact a judge of the district court and provide relevant information in support of a higher bail" if the officer "has reasonable cause to believe that the amount of bail set forth in this schedule is insufficient to assure the defendant's appearance or the protection of the public." [Doc. No. 64-1 at 2]. However, there is no allegation in the Amended Complaint that a peace officer or any other representative of the state is present at any first court appearances. According to the allegations, only the arrestee and Judge Strubhar are involved in these short video teleconference proceedings. *See* [Doc. No. 64 ¶¶ 16, 22–29]. Counsel cannot avoid the potential prejudice that inheres in a "particular confrontation" when there is no confrontation in the first place, *Wade*, 388 U.S. at 227; nor can an attorney help a defendant "meet[] his adversary" when there is no adversary to be met, *Ash*, 413 U.S. at 313. Thus, the first court appearance, as alleged in the Amended Complaint, is not a critical stage for Sixth Amendment purposes.[17]

---

[17] The Court recognizes that this order concludes that Plaintiffs have stated a procedural due process claim. The Amended Complaint alleges that first court

The *Coleman* Court recognized that counsel could aid a defendant by making effective arguments regarding bail, but it did so in the context of an *adversarial* bail hearing. Plaintiffs have cited non-binding authority holding that a bail hearing at which the state is not present and witnesses are not examined constitutes a critical stage. *See Farella v. Anglin*, No. 5:22-CV-5121, 2024 WL 3891132 (W.D. Ark. Aug. 21, 2024). But even in *Farella*, the judge setting bail would "consider[] the prosecutor's bail recommendation in his bail determination," thus putting the state "in a substantively trial-like, adversarial posture to Plaintiffs." *Id.* at *11.[18]

Here, nothing in the Amended Complaint suggests that Judge Strubhar considers similar recommendations from the prosecutor or that the state is in any way involved in the first court appearance. The Court is aware of no Supreme Court or Tenth Circuit authority holding that any pretrial event constitutes a critical stage when no representatives of the state (*e.g.*, a prosecutor or peace officer) are present.

---

appearances should provide "an opportunity for arrestees to be heard or present evidence." [Doc. No. 64 ¶ 21]. If Plaintiffs' due process claim succeeds and Defendants implement procedures that make first court appearances more "trial-like," such changes may then implicate the Sixth Amendment. But Plaintiffs presently challenge the first court appearances as they stand, and considering the well-pleaded factual allegations, these proceedings are not "trial-like" and do not constitute critical stages for Sixth Amendment purposes.

[18] Plaintiffs also point to *Betschart v. Oregon*, 103 F.4th 608 (9th Cir. 2024), as supplemental persuasive authority, *see* [Doc. Nos. 86 and 86-2], but there too, the court was faced with "adversarial" hearings. *See Betschart*, 103 F.4th at 623–24 (explaining that "[t]he defendant has the right to appear and present evidence, as do the district attorney and the victim" and there are "competing presentations of evidence").

Because the first court appearance is entirely non-adversarial and limited to determining pretrial custody, it is not sufficiently "trial-like" to trigger the right to counsel. Absent any confrontation with the state, this hearing is too far removed from the "core purpose of the counsel guarantee" to constitute a critical stage at which counsel must be present. *Ash*, 413 U.S. at 309. Therefore, the Court dismisses Plaintiffs' Sixth Amendment claim without prejudice.

## IV.    <u>CONCLUSION</u>

The Court concludes that Plaintiffs have plausibly alleged that they are entitled to declaratory and injunctive relief for their procedural due process claim, but they have failed to do so for their substantive due process, equal protection, and Sixth Amendment claims. Therefore, the Court GRANTS Defendants' Motion to Dismiss [Doc. No. 65] as to Plaintiffs' substantive due process, equal protection, and Sixth Amendment claims against both Defendants; these claims in the Amended Complaint are dismissed without prejudice. The Court DENIES the Motion as to Plaintiffs' procedural due process claim against both Defendants.[19]

---

[19] In the conclusion section of their Response, Plaintiffs seek leave to amend. *See* Response at 32. However, Plaintiffs cannot seek leave to amend in their response brief; any request for a court order "must be made by motion." Fed. R. Civ. P. 7(b)(1); *see* LCvR7.1(c) ("A response to a motion may not also include a motion . . . made by the responding party."); LCvR15.1 (explaining that a party moving to amend a pleading must attach the proposed pleading as an exhibit to the motion); *see also Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 771 F.3d 697, 706 (10th Cir. 2014) ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion." (quoting *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999))). Moreover, Plaintiffs have already been given the opportunity to amend their complaint once following motion to dismiss briefing. *See* [Doc. No. 60].

IT IS SO ORDERED this 23rd day of December 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE